**In re FRANKLIN NATIONAL BANK SECURITIES LITIGATION.**

**Sol Neil CORBIN, as Trustee in Bankruptcy of Franklin New York Corporation, Plaintiff,**

v.

**FRANKLIN NATIONAL BANK and Federal Deposit Insurance Corporation, as Receiver of Franklin National Bank, Defendants.**

**Bankruptcy No. 76 C 946.**

United States District Court, E. D. New York.

Dec. 6, 1979.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for plaintiff; Michael O. Finkelstein, William O. Purcell, Robert C. Macek, Joel M. Gross, New York City, of counsel.

Casey, Lane & Mittendorf, New York City, for defendant FDIC; William E. Kelly, Christopher P. Belmonte, New York City, of counsel.

## Memorandum of Decision

PLATT, District Judge.

In his amended complaint in this action plaintiff seeks, in seven separately stated claims, to set aside the conversion of, and to recover a Subordinated Capital Note in the amount of $30 million (the "Note") which Franklin New York Corporation ("FNYC") exchanged for additional shares of Franklin National Bank ("FNB") common stock in the Spring of 1974 (the "Note conversion" or "conversion"). As indicated in the caption this action is brought by Sol Neil Corbin, as Trustee in Bankruptcy (the "Trustee") of FNYC, which held all of the common stock of Franklin National Bank ("FNB") (except directors' qualifying shares).

The Trustee seeks to set aside the conversion in his first claim as unfair to FNYC under Section 713 of the New York Business Corporation Law ("BCL") and Section 70 of the Bankruptcy Act (11 U.S.C.

§ 110a); in his second, fourth and sixth claims as a fraudulent conveyance under Section 67(d), (2) of the Bankruptcy Act (11 U.S.C. § 107d (2) ); and in his third, fifth and seventh claims as a fraudulent conveyance under Sections 273–275 of the New York Debtor and Creditor Law ("DCL").

In its amended answer, in addition to a general denial of the material allegations of the complaint, the defendant asserted affirmative defenses, viz.: statute of limitations; laches; and that the claims are barred by *res judicata* pursuant to a prior settlement of previous actions.[1]

Earlier in this litigation defendant moved for an order pursuant to Rules 12(b)(7) and 19(a) of the Federal Rules of Civil Procedure dismissing plaintiff's complaint for failure to join a class of indispensable parties or for a stay until said class was made a party. This motion was denied in a Memorandum and Order dated December 8, 1976, *Corbin v. FDIC*, Docket No. 76 Civ. 946 (E.D.N.Y. 1976).[2]

Prior to this trial, the parties submitted Stipulations of Fact numbered 1 and 2 with corrected exhibit references which are incorporated herein by reference.

The trial by this Court without a jury was commenced on March 30, 1979, continued on April 12, May 16, June 15, 1979, and concluded on July 6, 1979.

Thereafter the parties submitted Proposed Findings of Fact and Conclusions of Law and Post-Trial Memoranda.

The Court has carefully considered all of the evidence and has adopted with amendments and modifications the Trustee's Proposed Findings of Fact so that the Court's Findings of Fact read as follows:[3]

---

1. The affirmative defenses of laches and *res judicata* were not specified among the contested issues in the Pre-Trial Order dated March 14, 1979, signed by counsel for both parties herein and hence are deemed withdrawn. In any event the defense of laches is taken care of in Discussion IV on page 85 *infra*.

2. In accordance with its Memorandum and Order of December 8, 1976 denying defendant FDIC's motion to dismiss the complaint for lack of an indispensable party, this Court has

been advised that FDIC did notify in writing all preferred shareholders of this lawsuit and of their right to intervene. None of the preferred shareholders, however, have appeared or attempted in any way to exercise that right.

3. Reference in the form "Stip. No. _____ § _____" refer to stipulations of fact numbered 1 and 2 dated March 14, 1979. References in the form "PX_____" or "DX_____" are to plaintiff's and defendants' exhibits respectively. References to the trial transcript are indicated

## FINDINGS OF FACT

### Parties and Nature of the Action

1. Plaintiff Sol Neil Corbin is the Trustee in Bankruptcy of Franklin New York Corporation, a bank holding company incorporated under the laws of New York and registered under the Bank Holding Company Act of 1956, as amended, which filed a voluntary petition in bankruptcy in the United States District Court for the Southern District of New York on October 16, 1974 (Stip. No. 1, ¶ 1).

2. At all relevant times, FNYC owned all of the common stock, other than directors' qualifying shares, of defendant Franklin National Bank, a national banking association organized in 1926 under the laws of the United States, which maintained its statutory office in Brooklyn, New York, and which became a member bank of the Federal Reserve System in 1971 (Stip. No. 1, ¶ 2). As of December 31, 1973, FNB was the ninth largest commercial bank in New York on the basis of deposits and the twentieth largest in the United States of the banks surveyed in The American Banker (PX 20).

3. Defendant Federal Deposit Insurance Corporation ("FDIC"), a corporation established by Act of Congress having the powers specified in 12 U.S.C. § 1811–32, was appointed Receiver of FNB by the Comptroller of the Currency on October 8, 1974, and has been and is acting as receiver of FNB (Stip. No. 1, ¶ 3).

4. This action is brought by the Trustee to set aside the exchange of a $30 million FNB Subordinated Capital Note held by FNYC for 1,200,000 additional shares of FNB common stock, which exchange was authorized, subject to the approval of the Comptroller of the Currency, by the boards of directors of FNYC and FNB on April 18, 1974.

### The Individuals Involved

5. Raymond T. Andersen was a director and Senior Vice Chairman of FNB and FNYC from December, 1973 and at all relevant times thereafter. During that period, Andersen was a member of the Executive Committee of FNYC (Stip. No. 1, ¶ 8).

6. George H. Becht was, on and about April 18, 1974, Executive Vice President and Secretary of FNYC and FNB (PX 130).

7. Harold V. Gleason was a director, Chairman and Chief Executive Officer of FNB and FNYC from before January 1, 1972 through June 20, 1974. During this period, Gleason was a member of the FNYC Executive Committee. (Stip. No. 1, ¶ 15).

8. H. Erich Heinemann was Vice President for Corporate Planning of FNB from August, 1973 until May 12, 1974 (PX 60, p. 117).

9. William W. Hichborn, Jr. was, at all relevant times, Controller of FNB (Stip. No. 1, ¶ 20).

10. Paul Luftig was a director, President and Chief Administrative Officer of FNB and FNYC from May 18, 1972 until May, 1974 (Stip. No. 1, ¶ 17).

11. John Sadlik was Executive Vice President of FNB and FNYC, Treasurer of FNYC, and Cashier and Chief Financial Officer of FNB from before January 1, 1972 through October 8, 1974 (Stip. No. 1, ¶ 9).

12. Norman B. Schreiber was a director of FNB and FNYC, and Chairman of the Executive Committees of FNB and FNYC, from February 1, 1974 until September 24, 1974 (Stip. No. 1, ¶ 10; Schreiber Dep. 6).

13. Peter R. Shaddick was a director of FNYC from June 21, 1973 through May 13, 1974. Shaddick became the Chief Executive Officer of the International Department of FNB in 1972 and actively directed and supervised foreign exchange trading during 1973 and 1974 (Stip. No. 1, ¶ 11).

by the name of the witness testifying and the page or pages on which his testimony appears. References in the form of "Tr.____" refer to pages of the trial transcript containing other than witness testimony. References to deposition testimony are indicated by the name of the witness followed by "Dep." and the relevant page numbers. References in the form "¶ ____" are to paragraph numbers in the findings of fact.

14. Gordon J. Crook, president of Lesta Research, Inc., was a consultant employed to perform certain computerized financial analyses for FNB from October, 1973 until May, 1974 (Crook 155–57, 214).

15. James E. Smith was, at all relevant times, Comptroller of the Currency (PX 43, ¶ 1).

16. Charles M. Van Horn was, at all relevant times, Regional Administrator of National Banks for the Second Region (which includes New York) of the Office of the Comptroller of the Currency from 1963 to 1978 (Van Horn 494–95).

17. Frank Wille was, at all relevant times, Chairman of defendant FDIC (PX 42, ¶ 1; PX 49).

18. Ralph M. Hitchcock, Jr. was, at all relevant times, head of the Problem Bank Section of FDIC's Division of Bank Supervision (Hitchcock 562–63).

19. From January 1, 1974 through May 21, 1974, with the exceptions noted, the FNYC and FNB Boards of Directors were composed of the following members:

Raymond T. Andersen (FNYC and FNB);
Joseph A. Beisler (FNYC and FNB);
Carlo Bordoni (FNYC);
Howard D. Crosse (FNYC and FNB);
Harold V. Gleason (FNYC and FNB);
William J. Hogan (FNYC and FNB);
Sol Kittay (FNYC and FNB);
Charles H. Kraft (FNYC and FNB);
William B. Lewis (FNYC and FNB);
Paul Luftig (FNYC and FNB);
Michael J. Merkin (FNYC and FNB);
Norman B. Schreiber (from February 1, 1974) (FNYC and FNB);
Robert N. Sears (FNYC and FNB);
Peter R. Shaddick (until May 13, 1974) (FNYC);
Michele Sindona (FNYC);
James C. Slaughter (FNYC and FNB);
James G. Smith (FNB);
John J. Tuohy (FNYC and FNB);
Frank G. Wangeman (FNYC and FNB); and
Harold A. Webster (FNYC and FNB) (Stip. No. 1, ¶ 13).

*Issuance of the Note*

20. In November, 1971, FNYC issued and sold to the public $35 million in principal amount of 8-year notes (due 1979) with interest payable semi-annually at 7.30% per annum. Morgan Guaranty Trust Company was and is the Indenture Trustee for the noteholders (Stip. No. 1, ¶ 15). The prospectus by which the public offering was made recited that $30 million of the proceeds would be used to provide additional capital funds to FNB by means of a subordinated loan containing substantially the same terms as the notes sold to the public (PX 101, at p. 2). On November 15, 1971, FNYC loaned FNB $30 million, taking back the Note and a Subordinated Capital Note Agreement, both of which were signed by Harold Gleason, as Chairman of FNB's board (PX 130). The Note was subordinate to all indebtedness of FNB, including the 1963 Series 4¾% Capital Debentures of FNB (except in the event of the retirement of the Debentures prior to the due date) (PX 71) but was superior in right of payment to the 4.60% cumulative preferred stock of FNB (PX 72). In 1971, when the Note was issued, $30 million principal amount of Capital Debentures and $20 million of preferred stock were outstanding (PX 101, p. 3); when the conversion was authorized and carried out, the figures were $28.5 million of Capital Debentures and $17.7 million of preferred stock (PX 40; PX 96–A; p. 1; PX 124).

*The Genesis of the Conversion*

21. In May, 1973 FNYC management decided to acquire the Talcott National Corporation ("Talcott") (Stip. No. 1, ¶¶ 17–21). Under the Bank Holding Company Act of 1956, as amended, (12 U.S.C. §§ 1842(a), 1843(c)(8) ), approval of the Talcott acquisition by the Board of Governors of the Federal Reserve System (the "Board") was required. In acting on applications, the Board considers the financial resources of both the holding company and "the banks concerned" (12 U.S.C. § 1842(c) ). FNB had insufficient equity to meet one of the Board's benchmarks, the 9% "invested as-

sets ratio" (Rafanello Dep. 12–17; Sadlik Dep. 13–18; PX 109). Accordingly, at the first meeting to discuss the Talcott application between FNYC and Board officials on May 17, 1973, Board officials indicated that, subject to further study, total capital of FNB should be increased by $70 to $75 million and equity capital by "up to $50 million." The officials noted that these capital plans did not have to be "fully implemented" when the application was filed, but that "the bank would be expected to follow the program after the acquisition" (PX 108).

22. After discussing the matter with investment bankers, Sadlik proposed to Benjamin Stackhouse of the Board that the equity formula could be met in connection with the Talcott application if FNYC took various steps to increase capital, including a conversion of the Note into common stock (PX 108). This was followed by a formal letter, dated June 4, 1973, from Sadlik to Stackhouse in which Sadlik proposed a financing plan for the Talcott acquisition consisting of (1) the issuance of $60 million in convertible debentures by FNYC of which $25 million would be contributed to the capital of FNB, (2) the conversion of the Note into equity, and (3) an additional $35 million of capital for FNB within two years after the Talcott acquisition (Stip. No. 1, ¶ 21; PX 112).

23. In August, 1973 FNYC filed with the Board an application, dated as of June 30, 1973, for approval of the Talcott acquisition (Stip. No. 1, ¶ 24). As part of the application, FNYC presented a five-year forecast, including as one of its assumptions that the Talcott acquisition would be effective January 1, 1974, with the Note converted on that day (PX 113, at unnumbered p. 2). FNYC proposed to buy a controlling interest in Talcott from Fasco, S.A. (which was controlled by FNYC director, Michele Sindona) for $27 million in cash.

24. In December, 1973 and January, 1974, Board staff members indicated to Paul Luftig, President and Chief Administrative Officer of FNYC and FNB, that the application would probably be denied and

urged FNYC to withdraw it (Stip. No. 1, ¶¶ 26, 27; PX 155).

25. Instead of withdrawing its application, FNYC submitted to the Board an amended financing plan in which the consideration for the Talcott shares held by Fasco was changed from cash to FNYC stock, and the cash from a proposed $30 million loan from an unaffiliated New York City bank was to be used to increase the equity capital of FNB (PX 146). In February, FNYC filed an amended application with the Board reflecting this amended financing plan (Stip. No. 1, ¶ 30). Like the previous application, the new one assumed that the Note conversion would take place when the Talcott acquisition became effective, and the new assumed effective date was April 30, 1974 (PX 128, at p. 1).

26. The FNYC press release of January 17, 1974 which announced the amended financing plan merely stated that the change had been made, without giving a reason (PX 148). The minutes of the January 17, 1974 FNYC directors' meeting at which the change was authorized also gave no reason for the change (PX 22).

*The Comptroller's Role*

27. During the period when the Talcott application was pending, the Comptroller of the Currency also was concerned with the condition of FNB. A national bank examination as of November 14, 1973 by the Office of the Comptroller ("OCC"), the report of which was completed in March, 1974, showed that FNB had serious financial problems (PX 95–A & B; PX 43, ¶ 5). Since the preceding examination in December, 1972, there had been a "marked deterioration" in the loan portfolio, the use of heavy short-term borrowings to support an "extremely overloaned position" was stated to be a matter of "utmost concern," and the bank was "badly undercapitalized" (PX 95–A, at p. 2).

28. At the Comptroller's direction, Charles M. Van Horn, Regional Administrator of the OCC, and Edward B. Lake, a national bank examiner who had supervised the November, 1973 examination, met first with FNB's senior officers at the end of

February and then with the directors on March 28 (Stip. No. 1, ¶¶ 31, 32; PX 94; PX 43, ¶ 5). At both meetings, FNB was told that the Comptroller wanted "a written program, satisfactory to the Comptroller of the Currency, by which the bank proposes to deal with the problems"; to avert misunderstandings, Norman Schreiber, director and chairman of the FNYC and FNB executive committees, was given a two page agenda of the areas of concern (Stip. No. 1, ¶ 31; PX 94). According to Van Horn's memorandum concerning these meetings, Lake "pointed out that capital protection is inadequate and that consideration should be given to the injection of additional capital funds" (PX 94). It is not known whether the conversion was discussed at those meetings (Van Horn Dep. 26–27); in Van Horn's view, the conversion would not have constituted the "injection of additional capital funds" suggested by the Comptroller (Van Horn 539–40).

29. In response to the Comptroller's request for a written program to deal with FNB's problems, FNB submitted to Van Horn on April 4 a formal letter signed by Messrs. Gleason, Schreiber, Luftig, Shaddick, Andersen, and Merkin, which detailed management's plan for dealing with the bank's problems (PX 134). Under the heading "Capital Adequacy," the letter reported that FNYC had borrowed $30 million from an unaffiliated New York bank (Manufacturers Hanover Trust Co. ("MHTCo")) and would invest the proceeds in FNB common stock (*id.* at p. 6). It stated that when "market conditions permit" FNYC would make a public offering of $30 million of common stock, the proceeds to be invested in common stock of the bank (*id.*). The proposed Note conversion was also mentioned as a step that would be taken, should Talcott be approved:

"*Should Franklin's pending acquisition of Talcott National Corporation be approved*, prior to consummation Franklin New York Corporation will invest the Bank's 7.30% capital note of $30 million due in 1979, now held by the Corporation [FNYC], from debt to equity" (*id.*) (emphasis supplied).

30. The Note conversion was thus presented to both the Board and to the Comptroller as contingent on the Talcott acquisition. The Comptroller had no objection to this program and Van Horn testified that the OCC Regional Office did not object (Van Horn 540–41). Management of FNYC and FNB took steps showing a belief that Talcott would be approved, since the directors of FNYC, at their March 28 meeting, reviewed and then authorized the filing of a registration statement covering the issuance of FNYC shares to Talcott shareholders (PX 100), and also adjourned the annual meeting so that the Talcott acquisition could be included as part of the agenda (PX 99).

*The Common Directors Authorize the Note Conversion*

31. Sometime before April 18, 1974, Franklin management decided to change its plan to convert the Note only after approval of the Talcott acquisition (¶¶ 22–23, 25–26, 29–30, above) and to recommend the conversion at the FNYC and FNB directors' meetings of April 18, prior to the Board's decision on the Talcott application. This decision was apparently made at the last minute, since the typed FNYC agenda sent to the directors on April 11 includes no reference to Talcott or the Note conversion. (Gleason subsequently added to his copy a heading entitled "Talcott" with three proposed actions, of which the note conversion was the third (PX 90).) The minutes of the FNYC board meeting recite that the Chairman stated to the directors that FNYC "had committed in its application to the Federal Reserve Board relating to its proposed acquisition of Talcott National Corporation" to convert the 7.30% Note (PX 91). The minutes then report: "The Chairman added that it was management's judgment that it would be desirable to effect such exchange at this time" (PX 91). Following this, the same persons, acting first as directors of FNYC and then as directors of FNB, authorized the officers of their respective corporations, subject to the approval of the Comptroller, to exchange the Note and issue the FNB stock (Stip. No. 1, ¶ 38).

Only the common directors of FNYC and FNB boards were present at these meetings. The FNYC resolution reads as follows:

"RESOLVED, that *subject to approval of the Comptroller of the Currency*, the Corporation exchange the 7.30% Subordinated Capital Note due November 15, 1979 of Franklin National Bank in the principal amount of $30,000,000 which it holds for 1,200,000 shares of the common stock, par value $5 each, of the Bank, at $25 per share, and that any executive officer of the Corporation is hereby authorized to take all action necessary or desirable in order to effect such exchange" (PX 91) (emphasis supplied).

The FNB resolution reads as follows:

"RESOLVED, that *subject to approval of the Comptroller of the Currency*, the Bank accepts the offer of Franklin New York Corporation to exchange the Bank's 7.30% Subordinated Capital Note due November 15, 1979 in the principal amount of $30,000,000 held by said Corporation for 1,200,000 shares of the common stock of the Bank, par value $5 each, at $25 per share, and that any executive officer of the Bank is hereby authorized to take all action necessary or desirable in order to effect such exchange" (PX 137) (emphasis supplied).

32. At this same meeting, the directors also reviewed financial statements for the first quarter which showed FNYC consolidated net income of only two cents per share, or $79,000. Earnings in the corresponding quarter of the previous year were 68 cents per share, or $3.123 million (Stip. No. 2, ¶ 8). These results were announced to the public on that day, the press release stating that income was "adversely affected by the sharp rise in the cost of short-term borrowings needed to carry assets during the 1974 quarter" (Stip. No. 2, ¶ 9; PX 142). The press release of April 18 did not mention that the boards of directors had authorized the Note conversion (PX 142).

33. The reason for making the exchange before obtaining Board approval for Talcott was not stated. The Franklin/Talcott mat-

ter was on the Board's agenda for April 17, but since FNB was regarded as a troubled bank, it was removed from the agenda to give the Board time to hear of late developments from First Deputy Comptroller Justin Watson (PX 117). Watson and Comptroller Smith talked with Schreiber on April 16 and during that conversation "noted the possibility of denial" of Talcott (Stip. No. 1, ¶ 36; PX 117). Schreiber responded that a denial would be a "terrible calamity" for FNB and on the next day arranged a meeting in Washington for April 19, the day after the directors' meeting scheduled for April 18, to plead the case (Stip. No. 1, ¶ 37; PX 132, 133).

34. Schreiber and Gleason met with the Comptroller and staff of the Board on April 19 (PX 26). By having the directors authorize the Note conversion on April 18, Schreiber and Gleason were able to report this affirmative step taken by Franklin; they also described a series of other steps that FNB was taking to improve its position (PX 117; PX 26). FNYC never issued a press release to announce the Note conversion, although it did so with respect to the MHTCo loan which was used to increase equity (PX 105) and the plan to make an offering to stockholders (PX 141; PX 39). In fact, there was no public disclosure of the conversion until July 23, 1974 when FNB's call report as of June 30, 1974 was published in the American Banker (Stip. No. 1, ¶ 66; PX 40).

35. When the directors authorized the Note conversion, it appears that most of them did not know that Board officials had indicated that Talcott would be denied (Andersen 269; Slaughter 472; Sadlik Dep. 58). As noted in ¶ 60 below, by the time the conversion was actually carried out (¶ 48 below), the Board had formally denied the Talcott application on May 1.

*The Conversion of the Note*

36. Following the April 18 meeting, Becht sent an interoffice letter to FNB Controller Hichborn instructing him to make the necessary entries to effect the conversion (PX 130). Despite the fact that the resolutions made the exchange "subject

to the approval of the Comptroller of the Currency," the conversion was shown immediately on the books of FNB and FNYC as of April 19 (PX 122), even though the necessary approval had neither been applied for nor obtained. Sadlik testified that this was due to a mistake: he directed that the transaction be put through before the Comptroller's approval because he thought Becht had requested approval, and, according to Sadlik, Becht thought that Sadlik had made the request (Sadlik Dep. 63).

37. The entries made on April 19 to effect the transfer were reversed on May 13 (PX 122) because authorization had not been received from the Comptroller (Sadlik Dep. 103). The FNB report of condition as of April 24, issued in response to the Comptroller's call and published in the July 23, 1974 issue of The American Banker, did not reflect the Note conversion (Stip. No. 1, ¶¶ 43–44; PX 40; 124), nor did the OCC report of examination dated May 14, 1974 (compare PX 40 with PX 96–A, p. 1).

38. The FNB stock could not have been issued prior to the effective date of the Comptroller's approval and the Comptroller would not have recognized the change in FNB capital as valid prior to that date (Van Horn 542–44, 546; 12 U.S.C. § 57; 12 C.F.R. § 14.8).

39. The Comptroller's approval was not even sought until after the Talcott application had been denied. In a letter dated May 3 and mailed on May 7, Sadlik wrote to Gerald H. Lipkin, Deputy Regional Administrator of National Banks, requesting approval to issue new shares in the par value amount of $6 million pursuant to the directors' resolution of April 18 (Stip. No. 1, ¶ 48; PX 118; Sadlik Dep. 87–89).

40. On May 9, Van Horn replied, giving tentative approval for the increase and directing Sadlik to execute a Comptroller's form entitled "Certificate of Payment for Additional Common Stock" (Form CC 7023–11) and return it with a request for an effective capital increase date (Stip. No. 1, ¶ 53; PX 119).

41. On May 14, Sadlik wrote to Lipkin enclosing the certificate dated May 14 and requesting a May 16 effective date (Stip. No. 1, ¶ 58; PX 120).

42. On May 16, Van Horn wrote to Sadlik enclosing the Comptroller's certificate approving the increase and directing that FNB's records reflect May 16 as the effective date (PX 131; Stip. No. 1, ¶ 61). Van Horn also directed Sadlik to complete an enclosed form entitled "Certificate of Completed Changes in Outstanding Capital Notes" (CC 7023–03) reflecting the retirement of FNB's subordinated debt. On May 20, Becht sent the Van Horn letter and the Comptroller's certificate to Hichborn for Sadlik's signature (PX 131; Stip. No. 1, ¶ 162).

43. On May 21, the necessary entries were made on the books of FNYC and FNB reflecting the retirement of the Note and the issuance of the stock as of May 16 (PX 122; Stip. No. 1, ¶ 63).

44. The FNB stock certificate apparently was not issued to FNYC until either May 23 or May 24. There are two similar tickets each showing the issuance of a certificate for 1,200,000 shares, dated respectively May 23 and May 24, one apparently for the shares paid for with the proceeds of the MHTCo loan, the other apparently for the shares paid for by the retirement of the Note (PX 73 and 74).

45. The process was ended on June 5, when Sadlik returned the completed second Comptroller's certificate, which recited that "reduction in capital notes in the aggregate amount of $30,000,000.00 completed on May 16, 1974 affects the capital notes originally issued on November 23, 1971 in the principal aggregate amount of $30,000,000" (PX 127; Stip. No. 1, ¶ 62).

46. The FNYC (Parent Only) Comparative Statements of Condition for the weeks ending April 26, May 3, 10, 17 and 24, 1974 reflect the Note conversion beginning April 19 through May 10 (Stip. No. 1, ¶ 45), reflect the reinstatement of the Note from May 13 to May 15, and again reflect the Note conversion beginning May 16, 1974. (See PX 79, 34).

47. Semiannual interest accrued on the Note through May 15 in the amount of $1,095,000 and was paid by FNB to FNYC on May 14. On the same day, $1,277,500, representing semiannual interest for the period ending May 15 on the $35 million outstanding FNYC notes, was transferred by FNYC to Morgan Guaranty for payment to the public noteholders (PX 121; Stip. No. 1, ¶ 57).

48. In light of the above findings, the true effective date of the Note conversion is no earlier than May 16, 1974 and no later than May 24, 1974.

*The Precarious Condition of FNB*

49. During the period the Talcott application was pending, FNB's condition was becoming increasingly perilous. The November 14, 1973 Report of Examination had stated, on the issue of FNB's liquidity:

"The bank's continuous use of heavy borrowings, particularly in the federal funds market, to support an extremely overloaned position is a matter of utmost concern. Average daily borrowings for the year 1973 ranged from a low point of $450 million in January to a high of $1,100 million in December. . . . The financing of long term credits by short term borrowings is an extremely dangerous course for any bank to follow and the overall situation should be the subject of a thorough review. It is imperative that the Directorate and senior management give immediate consideration to the soundness of this borrowing program in view of the bank's low liquidity position, weak capitalization and the serious problems that exist in the loan portfolio" (PX 95–A at p. 2).

In addition, with respect to foreign exchange, the report cautioned senior management on the "inherent risks of large open positions" (*id.* at p. 2–1).

50. FDIC also concluded that FNB's position as a heavy borrower of short-term funds exposed it to great danger. The OCC Reports of Examination concerning FNB were forwarded to FDIC from OCC and reviewed by FDIC employees (PX 76, 77; Hitchcock 563–65). The FDIC Review Examiner's memorandum, based on the examination as of November 14, 1973, included the following:

"The most serious problem at present is that of liquidity. Borrowings were continuous during 1973, averaging $780 million and reaching a peak of $1.1 billion. At the November 14, 1973 examination short-term borrowings equalled 192.5% of cash balances . . . While domestic deposits declined by $65 million between examinations, deposits in foreign branches have more than doubled. The stability of these foreign deposits is questionable, and the examiner stated 'The Bank would be hard pressed to meet a substantial decline in deposits and its position would be even more precarious should it lose access to the federal funds market.' Recent information received indicates that approximately $1 billion in foreign funds will be withdrawn from the bank and recent required financial disclosures may well have an adverse effect on the bank's ability to borrow. Certificates of deposit will also cause problems as there are approximately $370 million outstanding in amounts exceeding $500,000, of which $317 million are of the negotiable type . . .

*In view of the bank's already critical liquidity position, the expected runoff of a large volume of foreign deposits could result in the inability of the bank to meet its deposit obligations*" (PX 76, pp. 2–3) (emphasis supplied).

On the basis of the November 14, 1973 Report of Examination, FDIC on May 11, 1974 reclassified FNB from "Non-problem" to "Serious problem—PPO [Potential Pay-Off]" (Hitchcock Dep. 111–13; PX 76, p. 3).

51. The nature of the dangers to FNB was explained at trial by Gordon J. Crook, who performed consulting services for FNB from late 1973 until May, 1974, (*See* Crook, 154, *et seq.*) and by plaintiff's expert witness, Harry V. Keefe, Jr., founder and president of Keefe, Bruyette & Woods, Inc. ("KBW"), an investment banking firm specializing in the securities of banks and bank holding companies. (*See* Keefe, 8, *et seq.*).

A similar analysis was made by Comptroller of the Currency Smith in his affidavit dated October 8, 1974 (PX 43, ¶¶ 5–7).

52. FNB depended to a far greater degree than most other major banks on short-term "purchased" money—federal funds, repurchase agreements, certificates of deposit, Eurodollar deposits—rather than "core" deposit money (Keefe 22–23, 50; Crook 174–75; see also PX 95–A, p. 2; PX 76, p. 2; PX 60, p. 121). The entire increase in the FNB loan portfolio from 1971 to 1973 was funded with such purchased money (Keefe 22, 24–25, 50; PX 43, ¶ 5; PX 76, p. 2); essentially, FNB was borrowing short term and lending long term (Keefe 24; PX 138, p. 3).

53. FNB's excessive dependence on short-term purchased funds exposed it to two risks:

(a) First, there was the risk of "liability withdrawal" (Keefe 37), a risk that the lenders of the short term funds would not renew their loans to FNB (Keefe 22–24; PX 43, ¶ 5). Federal funds are the "flightiest money" because they have the shortest maturities (ordinarily one day) and because the banks lending them are "the most sophisticated lenders to the banking industry" and the most sensitive to bad news, with the easiest ability to withdraw their loans because of their short maturities (Keefe 22, 28–29, 50). Repurchase agreements and certificates of deposit are slightly less volatile because of their longer maturities (Keefe 22–23, 29, 50–51). Because the short-term lenders to Franklin could choose not to renew their loans at any time, FNB was in constant danger of being unable to meet its obligations (Keefe 23–24; Crook 202–03; Schreiber Dep. 7–8; see also PX 138, p. 2; DX 77; PX 43, ¶ 5).

(b) Second, such dependence on short term funds created a risk to FNB's earnings. A substantial portion of FNB's loan portfolio was on a fixed rate rather than a floating rate basis (Crook 172; Heinemann Dep. 38). The yield on FNB's substantial portfolio of debt securities was also at a fixed rate (Heinemann Dep. 38; Keefe 27–28). By contrast, the interest rate FNB had to pay for its short-term purchased funds was subject to sharp increases in rate (Keefe 27–28; Crook 175). Because the cost of short-term purchased money was rising sharply in 1974 while the yield on FNB's assets was not increasing, the increased cost of short term borrowing cut into FNB's already narrow profit margin and led to operating losses, because FNB began to pay more for money it borrowed than it was earning on the assets funded by that borrowed money (Keefe 27–28, 65, 89–90; Crook 174–75). This risk to FNB's earnings in turn increased the risk of "liability withdrawal," because the public announcement of low earnings or of losses would lead to a loss of confidence in FNB causing the lenders of short-term funds to withdraw their loans (Keefe 21–24, 34, 37; PX 60, p. 123).

54. FNB's securities portfolio offered no relief to FNB's liquidity difficulties. FNB's securities portfolio had a very long average maturity; as of December 31, 1973, an average of 18 years (Keefe 27, 28; PX 20, Note "B" to Consolidated Financial Statements). Because of this long average maturity and the consequent substantial depreciation in the securities portfolio, FNB was unable to sell securities to increase its liquidity without realizing additional losses (Keefe 27, 38; PX 43, ¶ 9; PX 77; PX 95–B, p. D). Similarly, the deteriorated condition of FNB's loan portfolio offered no relief (Keefe 81–82; PX 43, ¶¶ 13, 17).

55. FNB management in late 1973 and in 1974 was aware of the dangers created by FNB's dependence on short-term purchased funds, and on occasion held two or three meetings per day on the subject of short-term funding (Heinemann Dep. 6–9). In 1973, various banks had stopped selling Federal funds to FNB (DX 77; PX 60, p. 121). FNB's difficulties in rolling over its borrowings of Federal funds increased in April, 1974 (Crook 202–03, 208).

56. In April, on the basis of the then current cost of short-term funds, two FNB employees and a consultant to FNB each reached the conclusion that FNB would suffer a substantial operating loss in the

second quarter of 1974 because of the sharply rising cost of short-term borrowing. (*See* ¶ 57, *infra* ).

57. H. Erich Heinemann, Vice President for Corporate Planning of FNB, performed a computer model analysis of FNB's gross interest margin assuming that the federal funds rate would continue in the second quarter at its then current levels. Heinemann projected that FNB would have a $5 to $7 million loss in the second quarter of 1974, apart from any losses in securities or foreign exchange trading (Heinemann Dep. 9, 15–17, 37–39; PX 60, pp. 122–123). He concluded that if such a loss were to be made public, FNB's short-term credit sources would dry up and "the bank would have been out of business" (Heinemann Dep. 22–23, *see also* 37–39). FNB Controller Hichborn, working independently and without computer analyses, reached similar conclusions (Heinemann Dep. 15–17). Heinemann and Hichborn together conveyed their conclusions to Luftig on or about May 1 (Heinemann Dep. 17–19).

58. The third analyst to reach the conclusion that FNB was in imminent danger of insolvency was Gordon J. Crook of Lesta Research, Inc., who testified at trial. Lesta had been retained by FNB in 1973 to perform computer analyses of Franklin's financial condition (Crook 156–57). Crook produced a computer tabulation in March or April, 1974 which projected that the bank would suffer a loss of $4 to $7 million in its loan operations, on the assumption that it continued business as usual and short-term interest rates remained at their March-April levels (Crook 180–82; *see also* Ex. 138).

59. Crook communicated his projection of losses to Luftig orally in April (Crook 198–199) and then in a letter (PX 138), which Crook personally delivered on May 1 (Crook 203). The letter stated:

"As a result of our analyses, and in the light of the present actions being taken by Bank management, we must advise you that we believe that the Bank is in *immediate danger of becoming insolvent* " (PX 138, p. 1) (emphasis in original).

*The Run on the Bank*

60. On May 1, 1974, the Board publicly announced its denial of FNYC's application to acquire Talcott (Stip. No. 1, ¶ 46, PX 27). Desiring to avoid an adverse reaction from public statements, the Board, in a confidential letter to FNYC, amplified its reasons, including the "unsatisfactory condition" of FNB (PX 28).

61. On the basis of projections of second quarter losses, Heinemann concluded that if management wanted to preserve any value for FNYC shareholders it had to accomplish a merger. Heinemann conveyed these views in separate meetings on May 6 to Luftig, Andersen, and Shaddick, three of the six members of the FNYC Executive Committee (Heinemann Dep. 39–41). Because of FNB's increasing funding problems and poor operating results, Andersen, independently of Heinemann and Crook, had decided over the weekend of May 4–5 to recommend a merger at the Executive Committee meeting scheduled for the afternoon of May 6 (Andersen 282–83). There was no disagreement, the Committee voting to seek a merger with MHTCo or other interested banks (Stip. No. 2, ¶ 12; PX 30; Andersen 282–84; Heinemann Dep. 39–41).

62. On or about May 7, in light of the small profit for the first quarter and management's preliminary estimate of operating results for the second quarter, Franklin management decided to recommend to the FNYC and FNB boards of directors that they not declare the regular second quarter dividend when they met on Thursday, May 16, 1974 (Stip. No. 1, ¶ 50; PX 33). Fearing that the announcement of this decision, in the wake of the Talcott denial, would cause the lenders of short-term funds to FNB to withdraw their funds, Franklin senior management met on May 7 with FRB–NY officials, who agreed that FRB–NY would extend discount window loan assistance to FNB (PX 32; Stip. No. 1, ¶ 49).

63. On Friday, May 10, an FNYC and FNB press release announced the stopping of the dividend (Stip. No. 1, ¶ 50; PX 33). Keefe characterized this announcement:

"This was a shock, that the 20th largest bank in the country was stopping its dividend. We hadn't had this kind of shock in the financial market going back to 1932 or '33" (Keefe 34).

64. During the week of May 6–10, senior management began to learn that FNB had suffered catastrophic foreign exchange losses as a result of activities by foreign exchange traders. The first indication to senior management of these losses was Shaddick's report to the FNYC Executive Committee on May 6 that he had fired foreign exchange trader Donald Emrich upon the discovery of unrecorded foreign exchange contracts (PX 30; Andersen 275). The information then available was disclosed in a press release of Sunday, May 12, which announced, *inter alia*, that unauthorized trading by a foreign exchange trader operating beyond his authority and without FNB's knowledge had been discovered and that FNB, as of the following day, May 13, would have sustained losses of $12 million and at May 10, 1974 rates had additional potential losses of $25 million, for a total of $37 million in foreign exchange losses (PX 141, p. 2; Stip. No. 1, ¶ 54). The release also announced a plan for two subscription offerings of FNYC stock totalling $50 million and that Fasco, A.G., controlled by Sindona, had agreed to purchase any shares not subscribed for pursuant to the public offering (PX 141). The release also noted that FNYC had requested that the SEC suspend trading in its stock; such trading was suspended on May 13 and was never resumed (PX 141, p. 3).

65. The announcement of the dividend suspension on Friday, May 10, and of the foreign exchange losses on Sunday, May 12, produced, as was expected, a massive withdrawal of funds from FNB (Stip. No. 1, ¶ 52; PX 42, ¶ 4; PX 43, ¶¶ 7–9; *see also* PX 25). Federal funds loaned to FNB by other banks dropped from $335.4 million on May 8 to $12.8 million on May 16. By May 21, these borrowings had dropped further to $3.5 million (PX 25). Demand deposits dropped from $941 million on May 7, to $735 million on May 16, to $701 million on May 21 (Keefe 51; PX 25). By this last date, FNB had lost approximately $1 billion in funds from various sources (PX 25) which it never regained. The market for FNYC's short-term commercial paper also disappeared in this period. Prior to May, FNYC was rolling over more than a million dollars a week of such paper, but after May 2 sold no new paper and thereafter suffered large outflows as outstanding paper became due (PX 75).

66. In this crisis of confidence, FNB was saved from immediate collapse only by FRB–NY acting as lender of last resort (PX 42, ¶ 4; PX 43, ¶ 9; PX 49, pp. 4–5). Beginning on May 10 FNB had to make daily resort to the FRB–NY discount window to stay afloat (Stip. No. 1, ¶ 52; PX 42, ¶ 4; PX 43, ¶ 9). The loan mounted very rapidly. By the close of business on Thursday, May 16, FNB's loan at the discount window had reached $880 million. By May 21, when the conversion was reflected on the books of FNYC and FNB, it had reached $1 billion. Between that date and October 8, 1974, when FNB was closed and the loan assumed by FDIC (Stip. 1, ¶ 3) the loan increased to more than $1.7 billion (PX 139).

67. The discovery of the foreign exchange and other losses in May 1974 required the restatement of FNYC financial statements for the first quarter of 1974. While preparing that restatement, a team of personnel from the FNB controller's office completed on May 20, 1974 a schedule of projected losses for 1974. Its projections showed that FNB would suffer a loss of $84.1 million for the first six months of 1974, and a total of $88.4 million for the year (PX 102; Schreiber Dep. 10–14). On the basis of this projection, Schreiber also reached the conclusion that Franklin could not survive as an independent entity, even if the plan for the injection of $50 million new capital mentioned in the May 12 press release were successful, because FNB required $200 to $250 million in additional capital in order to survive (Schreiber Dep. 13–15, 21). Schreiber communicated this conclusion to other Franklin directors and officers (Schreiber Dep. 36–37) and to Board, FDIC and OCC representatives at

meetings in Washington, D.C. on May 22 and 24, 1974 (PX 37; PX 150, pp. 3–4; Schreiber Dep. 15–18, 36–37).

*The Effort to Sell FNB*

68. Pursuant to the May 6, 1974 resolution of the FNYC Executive Committee (¶ 61, above), officers of MHTCo and of FNB and FNYC met between May 7 and May 11, 1974 to discuss the possibility of a merger. In the meeting on May 10, MHTCo was told about the operations of FNYC and FNB, and specifically about FNB's domestic banking problems. In addition, MHTCo was told that FNB had suffered substantial foreign exchange losses (Stip. No. 2, ¶ 14).

69. On May 11, 1974, MHTCo officers met with their FNB or FNYC counterparts to review FNYC's and FNB's operations. (Stip. No. 2, ¶ 15; Andersen 285). Later that day, John F. McGillicuddy, President of MHTCo, told Luftig that the risks to MHTCo, particularly those surrounding foreign exchange, were too great to pursue a merger (Stip. No. 1, ¶ 15). Gabriel Hauge, MHTCo's Board Chairman, informed FRB–NY that his bank's "review of Franklin's books indicated that there was nothing left on Franklin's bottom line" (PX 152, p. 22000008). Subsequently, McGillicuddy confirmed to Alfred Hayes, President of FRB–NY, that MHTCo was not interested in a merger "because of the sizeable loss writeoffs involved" (PX 152, p. 22000009).

70. After MHTCo bowed out, Franklin, with governmental help at the highest level, pursued its merger efforts with Bank of New York, Chemical Bank, Bankers Trust Co., Morgan Guaranty Trust Co., Barclays Bank and National Westminster Bank. These efforts to sell FNB are detailed in a chronology prepared by the Board (PX 152). On June 3, the directors of FNB and FNYC appointed a special committee to explore and negotiate a merger, whose members were Gleason, directors Kittay and Slaughter, and, as chairman, former Secretary of the Treasury David Kennedy (PX 143).

71. Nothing came of these extensive merger talks. By May 14 it had become obvious to some FNB officers that merger efforts were fruitless; Franklin never received an offer for an unassisted takeover or merger (PX 49, pp. 6, 15; Andersen 289).

72. After the failure of the attempts to negotiate an unassisted merger, on July 2 Comptroller Smith wrote to Chairman Wille of FDIC that merger talks had been "fruitless" and requested FDIC to take the lead in fashioning an FDIC-assisted purchase and assumption transaction (PX 153; PX 42, ¶ 5; PX 43, ¶ 15; PX 49, p. 15). Immediately after receiving this letter, Chairman Wille contacted twenty banks and bank holding companies headquartered or represented in New York State about their possible interest in an assisted transaction. In addition, at Wille's request, the Board communicated with the Bank of England, the Bank of Japan, and the Bank of Canada to determine if the larger banks in these countries with offices in New York might be interested (PX 49, p. 16).

73. During July, FDIC officials held meetings with sixteen of the institutions contacted. These included First National City Bank, The Chase Manhattan Bank, N.A., Manufacturers Hanover Trust Company, Chemical Bank, Charter New York Corporation, Marine Midland Banks, Inc., The Bank of New York, European American Bank & Trust Company, Barclays Bank of New York, Algemene Bank Nederland, N.V., Royal Bank of Canada Trust Company, First Commercial Banks, Inc., United Bancorporation, Lincoln First Banks, Inc., and First Empire State Corporation. In these meetings, FDIC provided the banks with financial information on FNB and outlined a possible purchase and assumption transaction in which the takeover bank would assume all FNB deposit and other balance sheet liabilities, including FNB's liability on its Federal Reserve window loan, and purchase essentially all FNB assets. In addition, FDIC offered to indemnify the purchasing bank against unassumed liabilities and to purchase a capital note at least equal to $50 million (PX 49, pp. 16–18).

74. The reaction to this proposal was negative. As the banks studied FNB and responded, by the end of July it was appar-

ent to FDIC that only one bank was even interested in pursuing the proposal. The reasons for the rejections, as described by Chairman Wille, indicate why FNB was not salable as an entity:

"Many of the banks reporting a negative reaction stressed the magnitude of the proposed acquisition and the effect on their own earnings and their own stock performance of taking over FNB's low-yielding assets, particularly if they were not much larger than FNB itself. Several expressed the view that they could not justify the commitment of management time necessary to work out FNB's problems or the capital commitments necessary for such a transaction. In addition, a number of our visiting banks pointed out that the Federal Reserve Board was demanding, in its bank holding company decisions, a higher standard than heretofore of capital adequacy in the face of holding company growth, and that they already felt under significant pressure to improve their capital positions without the added burdens of an FNB acquisition" (*Id.*, pp. 19–20).

75. These objections made it clear that greater FDIC assistance would be required if FNB were to be sold. Accordingly, FDIC next proposed that it assume the FNB indebtedness to FRB–NY so that a bidding bank would be asked to assume only FNB's deposit and other nonsubordinated balance sheet liabilities, exclusive of the FRB–NY loan. In exchange, a bidding bank would acquire FNB assets of its own choosing, free of any security interest of the FRB–NY, of a value equal to the liabilities to be assumed, less the premium constituting its purchase price for the transaction. The effect of this proposal, insofar as prospective bidders were concerned, was to reduce the overall transaction from something less than $4 billion to something less than $2 billion. This reduced the magnitude of the earnings risk that banks were being asked to undertake and the amount of new capital that might be required (PX 49, pp. 19–21).

76. This plan was of interest to only a few banks (four to six), but its complexity was such that it took FDIC eight weeks of negotiations with the interested banks, FRB–NY, and federal and state banking agencies to develop a common set of bidding documents (PX 49, pp. 24–36). The closing papers consist of hundreds of pages of agreements, certificates, and exhibits (PX 41–48).

77. European American Bank & Trust Company ("EAB") won the FNB assets in competitive bidding. As a result of the agreements, which were executed on October 8, 1974, it assumed FNB liabilities of approximately $1.6 billion and selected assets in the approximate amount of $1.48 billion (PX 70). The remaining assets were sold by FDIC as receiver to FDIC in its corporate capacity (Stip. No. 2, ¶ 27), and are still in the process of liquidation. The provisions of the various agreements effectively prevent any payment on the FNB common stock until the liquidation is complete. FDIC estimates that completion of liquidation will take an additional eight to eleven years, and that when it is completed, there will be nothing left for FNB shareholders (PX 70). This estimate, of course, may change depending on claims now being litigated by FDIC (PX 70).

*Financial Condition of FNYC At Time of Note Conversion*

A. *Present Fair Salable Value of FNB Stock*

78. Apart from the FNB common stock and the Note, the liquidating value of FNYC's assets as of May 16, 1974, was $16.7 million (PX 86, 87). FNYC's liabilities on that date were $75.5 million, consisting of the $35 million obligation to the public noteholders, the $30 million MHTCo note, $10.1 million in outstanding commercial paper, and additional obligations of $.4 million (PX 86, 87). For FNYC to have been solvent on that date, the "present fair salable value" of FNYC's interest in FNB would have had to exceed the difference between those two figures, or $58.8 million. The evidence demonstrates that the FNB common stock held by FNYC had no substantial value on either a going-concern or a liquidating basis.

### (1) *Going-Concern Value*

79. As detailed above, ¶¶ 68 to 71, no one could be found to purchase FNB, despite the concerted efforts of FNYC and FNB, the Comptroller, the Board, FRB–NY and FDIC. From all the evidence, it seems clear that on a going-concern basis, therefore, FNB had virtually no "present fair salable value."

80. The testimony of plaintiff's expert witness, Harry V. Keefe, Jr., further indicates why FNB was not salable as an entity. Keefe stated that no one would buy the FNB stock held by FNYC because it was "worthless" on May 16, 1974 (Keefe 58–62, 80–81, 83). He reached this conclusion by a balance sheet analysis. Starting from the published book value of Franklin, he made adjustments for the reported foreign exchange losses, the depreciation of the bond portfolio ($110 million), and the operating losses resulting from the high cost of short term purchased money (Keefe 58–59, see also 60–62, 86–87). He concluded "it looks as though there was a negative or zero or inconsequential net worth to the company" (Keefe 59). Any purchaser of the bank, in order to bring Franklin up to peer average capital adequacy, would have been required to inject more than $200 million in new capital, without knowing what additional loan and operating losses there were in the bank (Keefe 62, 80–81, 83). Under those circumstances, no one would pay anything for FNB:

> "[I]n 1973, the company earned, according to its financials . . . $11,000,-000. I have not noted that people will invest $200,000 to get an $11,000,000 return. You are talking about a five percent return on your capital. Without knowing what really the further ongoing losses were in the company" (Keefe 62; see also 80–81, 83).

### (2) *Liquidating Value*

81. The starting point for computing the liquidating value of FNB common stock as of May 13, 1974 is the book value of the assets and liabilities of FNB, as recorded in the OCC Report of Examination dated May 14, 1974 (PX 96–A). According to Plaintiff's accountants, because certain FNB assets have a market value less than their stated book value and others have no liquidating value, various adjustments are necessary. These adjustments are summarized in PX 85, which was prepared by Plaintiff's accountants, Touche Ross & Co.

82. At trial on May 16, 1979, Plaintiff was prepared to call Joel Shiff, a partner in Touche Ross & Co., to testify concerning the accounting schedules prepared by that firm, PX 82–89. At that time, following a discussion between counsel and the Court, FDIC stipulated to the correctness of the valuations and calculations on PX 82–89, and contested only the appropriateness of liquidation accounting methods in the circumstances of this case (Tr. 405–14). Plaintiff accepted FDIC's stipulation in lieu of Shiff's testimony and did not call Shiff.

83. Because the May 14, 1974 OCC examination, which began at 8:00 a.m. on May 14 (PX 96–A, p. 1), uses book values as of the close of business May 13, 1974, the Touche Ross accounting schedules for FNB (PX 83–85, 89) make the relevant pro forma adjustments as of May 13, 1974.

84. The Touche Ross schedules use essentially the same methods as those used by FDIC at the time in determining what its exposure would be if FNB were to fail. FDIC's calculations are set forth in PX 77. The minor differences in some of the adjustments are reconciled in PX 89. Both the Touche Ross schedules, PX 83–85, and FDIC's schedule, PX 77, start with the book value figures for FNB assets and liabilities as stated in the OCC Report of Examination dated May 14, 1974 (PX 96–A, p. 1). The appropriate adjustments are as follows:

(a) As of May 13, 1974, the market value of the FNB securities portfolio was approximately $110.3 million less than its book value (PX 89) (Hitchcock 570–71, 574); both plaintiff and FDIC deduct this amount (PX 77, 83–85); (see PX 89). FDIC's actual experience in liquidating FNB's securities portfolio includes even greater losses than the May 13, 1974 estimate: through June 30, 1978, much of the portfolio had been

sold, with realized losses of $115.8 million (PX 70).

(b) Both plaintiff and FDIC deduct the amount of future tax benefits carried as an asset on the FNB books as of May 13, 1974 (PX 77, 83–85). FDIC's deduction for these tax benefits in PX 77, which was derived from the November 14, 1973 report, is $20,-064,000. In June, 1974, FNB wrote off $7,873,000 for this item (PX 39, p. 3; PX 135, p. 3) and plaintiff has used the lower figure in making the above adjustments (PX 83–85, 89).

(c) Both plaintiff and FDIC deduct an amount for leasehold improvements (PX 77, 83–85, see also PX 89).

(d) Both plaintiff and FDIC deduct 100% of the loans and other assets classified "loss" by OCC ($53,359,000, including $40,-000,000 foreign exchange losses and $13,-559,000 in loans classified "loss") and 50% of those classified "doubtful" by OCC ($20,-239,000) (PX 77, 85). OCC's experience with loans classified "doubtful" by national bank examiners is that 50% are uncollectible (PX 43, ¶ 17). FDIC's experience in liquidations of banks for which it is appointed receiver is also that approximately 50% of such loans are uncollectible (PX 163).

(e) Plaintiff has made an additional adjustment of $19,669,000, which represents 20% of the loans classified "substandard" by the Comptroller in the May 14, 1974 examination (PX 83–85). This additional adjustment is based on the estimate of Raymond T. Andersen.

85. This additional adjustment is reasonable in light of the following facts:

(a) Andersen, who has more than 30 years of experience in the banking industry, chiefly in credit and lending (Andersen 266), was brought to FNB in December, 1973 to become the senior lending officer with primary responsibilities in the area of credit and lending (Andersen 265–267). He was familiar with the FNB loan portfolio as it existed in May, 1974 (Andersen 289–290, 296).

(b) In April or May, 1974, Andersen estimated that the FNB loan portfolio con-tained approximately $50 million in shrinkage, based on 100% of "loss", 50% of "doubtful", and 20–25% of "substandard" loans (Andersen 297–99). That estimate was an attempt to determine the value of the loan portfolio if FNB were to seek a merger, which he reached by approaching it from the point of view of a lending officer of a potential merger partner who sought to value the portfolio (Andersen 297–98).

86. Substantial evidence in the trial record indicates that Andersen's estimate was conservative:

(a) In choosing between a payoff of insured depositors and a purchase-and-assumption transaction on the basis of at least cost to FDIC, Wille and his staff believed that the adjustments for 100% of "loss" and 50% of "doubtful" loans might not be sufficient because of potential losses in the substandard and unclassified loans of the bank. Accordingly, they made calculations based on FDIC's collection experience in all its receiverships from 1960 through 1970 (Wille Dep. 83–87; PX 163). Applying this historical experience, FDIC deducted an amount equivalent to more than 30% of loans classified "substandard" and an amount equivalent to more than 20% of unclassified loans (PX 163).

(b) FDIC's estimate of the results of liquidation indicates that Andersen's $50 million adjustment was less than the actual shrinkage in the loan portfolio (see PX 70 "Status Report"—Background section which indicates $88 million in loans were written off).

(c) Keefe's conclusion, ¶ 80 above, that the FNB common stock was worthless on May 16, 1974 was based on the assumption of an ongoing business (Keefe 80–81, 83). If the bank had been closed on May 16 and liquidated, the worthlessness of the stock would be "even less controversial" (Keefe 81), because liquidation of the loan portfolio would result in substantial additional losses:

"[W]e see here a company with above average loan loss experience, triple its peers at least, and with a valuation reserve only 40% of its peers, so I know from that data that this is a high-risk

loan portfolio. . . . [I]f I am going into liquidation, I have to liquidate the loans.

THE COURT: You are going to get probably even less?

THE WITNESS: The record tells us that this company is a high risk lender. That data is pretty incontrovertible. . . . When you liquidate a loan portfolio at a given date, what is it worth in 1974 when the real estate market was falling on its ear? This company is a big real estate lender . . . there might be some very severe losses, if you had to liquidate a loan. . . ." (Keefe 81–82; see also 62, 84–85).

In plaintiff's proposed finding of fact, paragraph 87 was omitted; we have duplicated this oversight simply to avoid the confusion that renumbering would involve.

88. The adjustments summarized above in ¶ 84 total $200.8 million (PX 83, 84, 85). Giving effect to those adjustments, the Touche Ross schedules show that the Note had a liquidating value of $21.5 million and the FNB common stock held by FNYC had no liquidating value (PX 83).

89. Giving effect to these adjustments, after the Note conversion, the Touche Ross schedules show that the FNB common stock had a liquidating value of $3.8 million (PX 84).

### B. *Insolvency of FNYC*

90. By reason of findings 88 and 89, FNYC's interest in FNB was worth far less than the $58.8 million necessary for the solvency of FNYC both before and after the Note conversion.

91. On a going concern basis, as stated in ¶¶ 79 and 80, the FNB common stock had no value and the Note had a value of no more than $30 million; FNYC was therefore insolvent by at least $28.8 million. The Note conversion did not affect the worthlessness of FNYC holding FNB common stock (Keefe 51–55), and consequently, after the conversion, FNYC was insolvent by $58.8 million.

92. On a liquidating basis, as stated in ¶¶ 81 to 89, above, the Note had a liquidating value of $21.5 million and the FNB common stock had no value; FNYC was therefore insolvent by $37.2 million (PX 86). After the Note conversion, the FNB common stock held by FNYC had a liquidating value of approximately $3.8 million; FNYC was therefore insolvent by $54.9 million (PX 87). Hence, the Note conversion deepened FNYC's insolvency by $17.7 million.

93. Even using the FNB liquidating values computed by FDIC in PX 77, FNYC was insolvent both before and after the Note conversion. Before the Note conversion the Note had a liquidating value of $30 million (PX 88) and the FNB common stock had no value (PX 88); FNYC was therefore insolvent by $28.8 million. After the Note conversion, the FNB common stock had a value of $14.2 million; FNYC was therefore insolvent by $44.6 million.

### C. *FNYC's Belief that it Would Incur Debts Beyond its Ability to Pay as They Matured*

94. On May 16, 1974, FNYC had semi-annual debt service obligations on its $35 million of 7.30% notes due 1979 and quarterly obligations on its $30 million MHTCo note due April 3, 1977 (PX 82). These obligations required interest payments of approximately $5 million annually: interest on the 7.30% notes was $2.555 million; interest on the MHTCo note was ¼% above MHTCo's prime; (PX 23; Stip. No. 2, ¶ 6). FNYC also had $10.125 million in commercial paper outstanding on May 16, 1974, all of which was payable within the year, and substantial operating expenses (PX 82, PX 75).

95. In addition, the MHTCo note provided that it could be called if in MHTCo's opinion there was an "impairment of financial responsibility" of FNYC (PX 23). The 7.30% notes could be called upon the "default in the payment of any indebtedness for borrowed money" of FNYC or FNB (PX 9, § 6.01(d) ). Even if not previously called, the $30 million MHTCo note was due in April, 1977 and the $35 million of 7.30% notes were due in November, 1979.

96. Under the National Bank Act, FNB was prohibited from paying dividends to FNYC in the absence of earnings (12 U.S.C. § 60(b) ), and the Comptroller's regulations absolutely prohibit any dividend that would "impair capital" (12 C.F.R. § 7.6100). In addition to these restrictions, the FNB 4¾% capital debentures provided that no dividends could be paid on the common stock unless the amount of such dividends would not exceed the net profits of the bank earned after June 30, 1963, less dividends, plus $3.5 million (PX 71 Section 5.4). The preferred stock had a similar restriction (PX 72, p. 12). As reported by FNB, the undivided profits of the bank as of year-end 1973 (which should closely approximate the formula figure) were $39.8 million (Stip. No. 1, ¶ 14), which would have been wiped out by the $84 million losses incurred in the first six months of 1974 (PX 102, p. 238); the greater part of these losses were known to management prior to May 16 as a result of the investigations which followed the discovery of the foreign exchange losses (PX 104; Schreiber Dep. 10–13; PX 141; PX 96–A). In light of FNB's doubtful prospects for survival, let alone for sufficient profitability to pay dividends, it was clear as of May 16, 1974 that FNB would be unable to pay any dividends to FNYC in the foreseeable future.

97. PX 82 was prepared by Touche Ross & Co., and projects FNYC cash requirements for six years beginning on May 16, 1974. Assuming no payment of dividends, FNYC would have fallen $637,000 short of its cash requirements in the first year following the Note conversion; almost $5 million short in the second year; and almost $35 million short in the third year, when the MHTCo note fell due. The Comptroller's contemporaneous view supports this conclusion; on October 4, national bank examiner Lake concluded in a letter to the Comptroller that since FNB dividends were not available FNYC "will run out of cash early in 1975 and bankruptcy is imminent . . ." (PX 154, p. 2).

98. FNYC was well aware in May of its prospective inability to meet its obligations:

(a) In April, after the disclosure of the poor first quarter earnings, Andersen reviewed the terms of the MHTCo $30 million note (Andersen 277–79), and examined it again after the disclosure of the foreign exchange losses (Andersen 279), on both occasions because of a concern that the MHTCo note might be called (Andersen 279–81). He discussed this concern with Luftig (Andersen 282). Had the MHTCo note been called, FNYC would have been unable to pay it out of cash available to it at the time (Andersen 282).

(b) On May 21, Sadlik wrote an inter-office letter to Schreiber in which he noted:

"Most of the interest on the 7.30% Capital Notes ($35.0 million) and the interest on the MHT loan of $30.0 million must be provided by the bank through the payment of dividends to the corporation. Since the bank will not have sufficient earnings to pay dividends, permission would be required from the Comptroller of the Currency. It is recommended that the matter be discussed with the Comptroller" (PX 123, p. 2).

It is not known whether the Comptroller was ever approached on this point (Sadlik Dep. 123–25; Schreiber Dep. 18–20).

(c) In a press release which was reviewed in draft by the directors on June 3, 1974 (PX 140, PX 38) and issued on June 20, 1974 (PX 39), FNYC noted that, because of FNB's inability to pay dividends and FNYC's limited assets apart from the FNB stock, it would not have the funds to meet its obligations unless these could be raised by a proposed subscription offering of common stock:

"Mr. Gleason pointed out that as a result of the inability of the bank to pay dividends to Franklin New York Corporation, which holds all of the bank's Common Stock, and the fact that the assets of Franklin New York Corporation, other than the Common Stock of the Bank, were limited, Franklin New York Corporation is dependent upon the successful completion by early 1975 of the first portion of the previously announced proposed $50 million subscription offering of

the Common Stock of Franklin New York Corporation to provide funds with which to continue to meet that Corporation's obligations, principally debt service on its $35 million of 7.30% Notes due November 15, 1979 and its $30 million Note due April 3, 1977. He added that the holder of the latter Note may presently have the right to demand immediate payment from Franklin New York Corporation, which could, in turn, result in similar action under the 7.30% Notes, and could result in resort by these creditors to collection procedures, including a levy on the assets of the Corporation" (PX 39, pp. 8–9).

The ingredients of this conclusion—FNB's losses, FNYC's obligations, and the restrictions on dividend payments described in the release—were all existing and known to FNYC management and directors prior to May 16, 1974. The proposed stock offering was never made and, in view of FNYC's financial condition, would have had no reasonable chance of success in any event.

(d) By the end of August, Sadlik reported to Andersen that FNYC would have insufficient cash to pay the interest coming due on the MHTCo note in September and on the 7.30% notes in November and sought advice as to which of the few remaining assets should be sold (PX 125).

*Significant Events Not Considered by FNYC's Directors in Approving the Note Conversion*

99. When they voted to authorize the Note conversion on April 18, 1974, the FNYC directors were unaware that: (i) in the first quarter of 1974, FNYC had actually suffered a loss of $40.4 million, or $8.75 per share (PX 39; Stip. No. 2, ¶ 17); (ii) FNYC's 1973 quarterly and annual reports substantially overstated consolidated earn-

ings (Stip. No. 2, ¶¶ 18a, 21); and (iii) the Board had indicated, prior to April 18, that the Talcott application would probably be denied (¶¶ 33–35).[4]

100. After voting to authorize the Note conversion on April 18, the FNYC directors were unaware that the Note conversion was not actually completed until later[5] and never reconsidered the question prior to that date (Slaughter 484, PX 104; PX 35; PX 149). Thus, they never considered in connection with the Note conversion the revelations of losses that occurred between April 18 and May 16.

101. Had the FNYC directors considered these facts in determining whether to authorize the Note conversion, their actions would obviously have been much different. Messrs. Andersen, Beisler, Schreiber and Slaughter testified that they would not have gone ahead with the Note conversion had they known such facts (Andersen 270–75; Beisler Dep. 135–36; Schreiber Dep. 20; Slaughter 482–83). Even Messrs. Kraft and Sears, who were more equivocal, testified that such facts would have presented an entirely different situation (Kraft Dep. 88, 92–93; Sears Dep. 129–31).

*The Note Conversion Was of No Benefit to FNYC or FNB*

102. The Note conversion had two major adverse effects on FNYC:

(a) FNYC was deprived of its position as a subordinated creditor of FNB in the amount of $30 million. In the event of insolvency, FNYC's claim against the FNB assets was thus subordinated to the claims of FNB's preferred shareholders. As a result of this loss of creditor position, FNYC's liquidating interest in FNB was reduced from approximately $21.5 million to approx-

---

**4.** These statements appear to be correct insofar as the record given to this Court is concerned except that it may be that one or more directors may have had more knowledge than others. (*See, e. g.,* ¶¶ 33 and 35 above).

**5.** The same is true with respect to this statement since both Becht (Executive Vice President and Secretary of FNYC and FNB) and

Sadlik (Executive Vice President of FNYC and FNB) knew and went so far as to reverse entries on the corporate records on May 13th and 15th and in all likelihood they conveyed or in any event should have conveyed the delay in perfecting the exchange and the reversals to President/Director Gleason and one or more of the other inside or management directors.

imately $3.8 million (¶¶ 88–89; PX 83, 84), deepening FNYC's already insolvent condition (¶ 92 above; PX 86, 87).

(b) FNYC was deprived of its right to interest on the Note at a time when its only other principal source of income, FNB dividends, was cut off by FNB losses.

103. The Note conversion was of no benefit to either FNYC or FNB:

(a) The additional FNB common stock received by FNYC for the Note was of no value in itself to FNYC, since FNYC already owned all of FNB's common stock except director's qualifying shares. (*See* ¶¶ 49–54, 65–67, *supra*.)

(b) Any slight improvement in FNB's earnings, because of reduced interest expense, had no effect on public confidence in FNB, because only consolidated FNYC earnings, which were not improved by the Note conversion, were reported to the public (Keefe 43–44, 53). Suggestions by FDIC's witnesses that the Note conversion would have somehow permitted FNB to expand and improve its operations are contradicted by the overwhelming evidence of FNB's incurable condition at the time of the Note conversion (¶¶ 49–54, 65–67) and the fact that the first public disclosure of the Note conversion on July 23, 1974 (¶ 34; PX 106, 107) had no beneficial effect whatsoever on FNB's condition or operations.

(c) The Note conversion did not give FNYC and FNB additional time to work out their financial difficulties or postpone FNYC's eventual bankruptcy. FNB was kept alive after May 13, 1974 only by the FRB–NY loan (PX 42, ¶ 4; PX 43, ¶ 9; PX 49, pp. 4–5) and when FRB–NY became unwilling to continue that loan was declared insolvent on October 8 (PX 43, ¶ 18).

(d) FNB's problems were so pervasive that only a massive injection of new capital—and not mere internal conversion of debt to equity—would have given any hope of rescuing it. Reliable estimates of the required amounts of additional capital were $200 to $250 million (PX 49, p. 6 (New York Clearing House member banks' estimate); Schreiber Dep. 13–15; PX 37; Keefe 51, 61–62).

(e) The ratios used by Keefe and others to evaluate the condition of FNB and other banks would not have been affected by the Note conversion because they were based on consolidated figures (Keefe 52–53).

(f) The Note conversion did not materially improve FNB's prospective earning ability and in particular did not affect the 1974 projections of substantial FNB operating losses and the consequences of those losses (Keefe 51–55; Heinemann 1/10/79 Dep. 41; Heinemann 2/13/79 Dep. 5–6; Crook 217).

*FDIC's Defense That the Note Conversion Was Required by Federal Bank Regulators*

104. Although the capital of FNB had been rated "inadequate" in OCC reports of examination, the conversion of debt into equity did not accomplish the increase in capital contemplated by the Comptroller's criticisms. It is not known whether the Note conversion was mentioned by Van Horn or Lake at their March 28, 1974 meeting with the FNB directors (Van Horn Dep. 26–27). The conversion, however, did not constitute the kind of "injection of additional capital funds" suggested by the Comptroller (Van Horn 539–40).

105. Neither Van Horn nor anyone else in the OCC ever required, directed or advised Franklin to convert the Note to additional FNB stock (Van Horn 549; Van Horn Dep. 100–101; Stip. No. 1, ¶ 31). Even prior to the Note conversion, FNB was always within the Comptroller's "rule of thumb" that debt capital should not exceed one-third of total capital (Van Horn 548–49; Van Horn Dep. 19). Van Horn knew of no occasion on which the Comptroller had directed any banking organization to convert debt to stock in order to bring a national bank within its rule of thumb (Van Horn Dep. 99–100).

106. Neither the Board nor FRB–NY ever urged, suggested or required Franklin to convert the Note (Rafanello Dep. 41–46).

## DISCUSSION

### I

### THE CONVERSION WAS NEITHER FAIR NOR REASONABLE TO FNYC

Section 713(b) of the New York Business Corporation Law ("BCL")[6] provides that where the votes of "interested directors"[7] are necessary to approve a contract or transaction:

> "the corporation may avoid the contract or transaction unless the party or parties thereto shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was approved by the board . . . ."

This means that unless the FDIC has affirmatively established that the exchange of the Note for FNB stock was fair and reasonable to FNYC, the plaintiff may avoid the transaction since on April 18, 1974, the same persons for both corporations voted to authorize the transaction.[8]

 The test is not whether the interested directors acted in good faith but rather whether "in the absence of arms-length bargaining" the transaction, viewed objectively, in fact was fair and reasonable. *Chelrob, Inc. v. Barrett*, 293 N.Y. 442, 450–461, 57 N.E.2d 825 (1944).

From any objective standpoint, the 1,200,000 shares of stock of FNB itself had no value whatsoever to FNYC since it owned virtually 100% of the outstanding stock of FNB.[9]

Any arguable value to FNYC in this case arose only from the end result sought to be achieved by the exchange, i. e., the acquisition of Talcott. The evidence shows that the FNYC Board of Directors and officers had been working to this end for many months, had devoted much time and effort to persuade the Board to approve the proposed acquisition and were most desirous of achieving this result.

Given the facts set forth above, there is little or no doubt in this Court's mind that the primary purpose of the Note conversion was to induce the Board to approve the proposed Talcott transaction. When this approval was denied on May 1, 1974, there existed, in this Court's view, no consideration for the surrender of the Note.

FDIC suggests, however, that there was a value to FNYC from the resultant change in the capital structure of FNB, i. e., in the reduction of FNB's debt. Thus FDIC argues that not only did the "interested directors" in good faith believe that the transaction was fair and reasonable to FNYC, but also, that it was so in fact because it served the purpose of improving the capital structure of FNB. This is true, the FDIC says, even though the conversion did not inject new money into the capital structure as the Comptroller of the Currency had been urging the directors to do. Any arguable benefit to FNYC from the satisfaction of this secondary purpose, however, was in this Court's opinion, completely dispelled on May 12, 1974, with the publica-

---

**6.** New York Law is apparently concededly applicable to this claim.

**7.** Section 713(a) defines a corporation's interested directors as those who "are directors, officers or have a substantial financial interest" in the other corporation with which the corporation enters into a contract or transaction.

**8.** It is not true, as FDIC argues, that the fairness doctrine applies only on a showing that the directors "stood to reap personal profit" from the Note conversion (FDIC Memo pp. 13–16, 18–19). *Chelrob, Inc. v. Barrett*, 293 N.Y. 442, 456–461, 57 N.E.2d 825 (1944).

**9.** Reduced to its simplest terms, if A owns 100 shares, or all of the stock of B Corp., which has

retained earnings and capital aggregating $1,000., then A's equity interest in B Corp. is $1,000. or $10. per share. If B Corp. splits its shares 2 for 1, or declares a 100% stock dividend, A's equity interest is still $1,000., the only change is that it owns 200 shares, each with an equity interest of $5. per share. The situation here is essentially the same. The sole question therefore is whether FNYC by giving FNB's $30 million Note back to FNYC received equivalent consideration in the enhancement of the value of its shares. While such might have been the case if the Talcott merger had been affected thereby, such was not the case here. (*See also* ¶¶ 102 and 103 above).

tion of the facts as to the first of the extraordinary losses and the potential massive concealed losses that FNB had sustained over the previous months.[10] Whatever intangible value might have accrued to FNYC on the consummation of the Note conversion (if the same had been or were deemed to have been, accomplished prior to May 6, 1974), was materially impaired on that date and rapidly demolished during the ensuing ten days, i. e., by May 16th.

The indisputable fact is that the FNYC Executive Committee knew as early as May 6th from a report by Peter R. Shaddick that he had fired foreign exchange trader Emrich on the discovery of the unrecorded foreign exchange contracts. FNYC's Executive Committee also knew on or before May 6th that (i) first quarter earnings of FNB (without taking into consideration the concealed losses) were negligible and (ii) two FNB officers, Vice President H. Erich Heinemann and Comptroller Hichborn, and FNB consultant Gordon Crook of Lesta Research, Inc. had reached the conclusion (independently of one another and without any knowledge of the concealed losses) that FNB would shortly be insolvent. As a consequence the Executive Committee voted to seek a merger with Manufacturers Hanover Trust Company or other interested banks.

At the very latest, on and in the days immediately after May 6th (if not before)

each interested director had a continuing fiduciary obligation[11] which they owed to FNYC to meet and take appropriate steps, by litigation or otherwise, to maintain the status quo and to attempt to prevent the subsequent approval of the conversion by the Comptroller of the Currency. In this connection it must be borne in mind that during the period between May 13th and 15th the conversion was reversed on the corporate records by the management of the corporations so as to effect the payment of the full six months interest due on the Note and it would have been a relatively simple matter to have maintained the status quo at this juncture, until all the facts were in and the situation was clarified.

In short, the Note conversion was in fact unfair and unreasonable on April 18th, unless the Talcott acquisition was effected thereby, there being no consideration for the transfer of the Note. Moreover, even if on that date it was not, it was clear prior to May 16th that it was. And in the Court's opinion the "interested" directors had a duty to monitor the situation and to take appropriate and immediate action in the event the facts warranted the same, as they did here, on or about May 6th and in no event later than May 16th. This was a continuing duty which at the very least lasted until the transaction was consummated on May 16th or 24th. There is no

---

**10.** By May 10, 1974 FNYC and FNB in a press release disclosed that management would recommend that FNYC's Board of Directors not declare the regular FNYC dividend at its next meeting on May 16th. Federal funds loaned to FNB by other banks plummeted from $335.4 million on May 8th to $12.8 million on May 16th. The market for FNYC's short term commercial paper, in excess of a million a week by the end of May, 1974 virtually disappeared.

**11.** The basis for this obligation in New York is found in the statutes. In general, § 717 of New York's Business Corporation Law states "Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." Banking directors are held to a higher standard. Article 13–B of New York's Banking Law, § 674, provides in part: "A director of a corporation or joint-stock association is deemed to

have such a knowledge of the affairs of the corporation or association, as to enable him to determine whether any act, proceeding or Omission of its directors is a violation . . . ." Moreover, case law in New York has refined and distilled the nature of the fiduciary duty for banking directors. In language particularly apt here, one court specified that:

> "Directors cannot . . . shut their eyes to *what is going on around them.* It is their duty to use ordinary diligence in ascertaining the condition of [the bank's] business and to exercise reasonable control and supervision of its officers." *Broderick v. Marcus,* 152 Misc. 413, 272 N.Y.S. 455 (N.Y.Co.1934), quoting *Martin v. Webb,* 110 U.S. 7, 3 S.Ct. 428, 28 L.Ed. 49 (1884). (Emphasis added.) *See, Litwin v. Allen,* official, 25 N.Y.S.2d 667 (Sup.N.Y.Co.1940); *see also, Briggs v. Spaulding,* 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891).

doubt in this Court's mind that had there been two independent boards of directors bargaining at arm's length, the conversion would have been restrained on or before May 16th and would never have been consummated.

## II

Even assuming that Section 713 of the BCL does not impose the continuing duty outlined above, the plaintiff may still attack the Note conversion herein as a fraudulent conveyance made in violation of Section 67d(2) [12] of the Bankruptcy Act and Sections 273–75 of the New York Debtor and Creditor Law ("DCL"). [13]

The question under these sections of the Federal and New York law is whether FNYC received "fair consideration" for its Note. The determination of fairness is deemed made "at the time when it (the transaction) became so far perfected that no bona fide purchaser from the debtor (FNYC) could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee (FNB) therein. (Section 67d(5)).

As the Trustee points out, since FNB had no right to the Note until it had paid for the same by the issuance of stock, the transaction was not made until May 23d or 24th when the new stock was issued.

Section 67d(1) of the Bankruptcy Act defines consideration as "fair", "when, in good faith, in exchange as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied." Section 272 of the DCL provides that there be both a "fair equivalent" and a "good faith" transaction.

Since the test of good faith is whether "the transaction carries the earmarks of an arm's-length bargain" (*Bullard v. Aluminum Co. of America*, 468 F.2d 11, 13 (7th Cir. 1972)), the same cannot be met in this case without a careful scrutiny of the fair equivalencies of the property transferred.

As we noted above, any semblance of fairness in the transaction was completely demolished on or before May 16, 1974, and the situation grew worse, not better, in the ensuing 8 days. [14] The only claim the FDIC might legitimately make with respect to the

12. Section 67d(2) provides in pertinent part:
 "[Transactions declared fraudulent.] Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; or (c) as to then existing or future creditors, if made or incurred without fair consideration by a debtor who intends to incur or believes that he will incur debts beyond his ability to pay as they mature.
 . . . ."

13. Sections 273–75 provide:
 "§ 273. *Conveyances by insolvent*
 Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
 § 274. *Conveyances by person in business*
 Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.
 § 275. *Conveyances by a person about to incur debts*
 Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

14. Beginning on May 8th, FNB made daily resort to the FRB–NY discount window to stay afloat. By the close of business on Wednesday, May 16th, FRB's loan at the discount window had reached 880 million dollars; and by May 21st it exceeded 1 billion dollars. (*See also* ¶¶ 60–67 above).

alleged fairness of the transaction subsequent to May 1, 1974, the date of the denial of the approval of the Talcott acquisition, is that the capital structure of FNB was improved by the conversion and that this made FNB a more attractive package to sell to or merge into another bank. The validity of this argument, of course, was shattered when Manufacturers Hanover Trust Company, after being advised of the massive concealed losses and reviewing the financial condition of the bank, concluded on May 11, 1974, that "there was nothing left on Franklin's bottom line" and that they were not interested. (*See* ¶¶ 68–71 above).

Again, in short, from and after May 11th there was simply nothing to justify transferring to a company which owned virtually all of the stock of a subsidiary, some additional shares of such stock in exchange for a 30 million dollar Note which carried with it the right to interest payments and priority over preferred and common stock holders' claims in a liquidation.

Absent fair consideration, the Trustee is entitled to a judgment voiding the exchange under the Bankruptcy Act and the Debtor and Creditor Law if (i) FNYC was insolvent at the time of the Note conversion *or* (ii) FNYC, following the exchange, was left with unreasonably small capital, *or* (iii) FNYC intended to incur or believed that it would incur debts following the Note conversion beyond its ability to pay as they matured.

### Insolvency

Section 67d(1)(d) of the Bankruptcy Act defines insolvency as follows:

"a person is 'insolvent' when the present fair salable value of his property is less than the amount required to pay his debts".

Section 271 of the DCL provides that:

"a person is 'insolvent' when the present fair salable value of his assets is less than the amount required to pay his probable liability on his existing debts as they become absolute and matured."

■ Under New York State law where a voluntary transfer is made when debts of the grantor are outstanding, the burden of going forward with proof of solvency is on the transferee. *See Wilson v. Robinson*, 83 F.2d 397 (2d Cir. 1936); *Cohen v. Benjamin*, 246 A.D. 866, 284 N.Y.S. 884, 886 (3d Dept. 1936). Under Federal law, on the other hand, the burden of proving insolvency is on the plaintiff. 4 Collier on Bankruptcy § 67.32.

If we leave aside for the moment the value of the common stock of FNB held by FNYC, the fair salable value of the remainder of FNYC's assets on May 15th, May 16th and May 21st is not really in dispute. (PX 81 and 86.)

| | Sadlik Certified Statement of Book Value on May 15, 1974 | Touche Ross & Co. | |
|---|---|---|---|
| | | Statement of Book Value on May 16, 1974 | Statement of Liquidating Value on May 16, 1974 |
| **ASSETS** | | | |
| Cash | | | |
| Regular Acct. | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 |
| Commercial Acct. | 947,335.79 | 1,308,000.00 | 1,308,000.00 |
| Investments | | | |
| Franklin National Bank | – | – | – |
| Franklin National Credit Corp. | 250,000.00 | 250,000.00 | 0 |
| TNC Acquisition | 10,000.00 | 10,000.00 | 0 |

| ASSETS | Sadlik Certified Statement of Book Value on May 15, 1974 | Touche Ross & Co. Statement of Book Value on May 16, 1974 | Touche Ross & Co. Statement of Liquidating Value on May 16, 1974 |
|---|---|---|---|
| **Securities** | | | |
| Capital Notes—FNB | $30,000,000.00 | $30,000,000.00 | $21,538,000.00 |
| Certificates of Deposit—FNB | 7,750,000.00 | 7,000,000.00 | 7,000,000.00 |
| Preferred Stock—FNB | 21,019.00 | 21,000.00 | 0 |
| Participations—Nat'l Corp. for Housing Partnership | 52,500.00 | 53,000.00 | 0 |
| Federal Land Banks—Coupon Strips | 2,809,020.35 | 2,809,000.00 | 2,809,000.00 |
| Gov't Nat'l Mtg. Assn.—Coupon Strips | 754,832.03 | 755,000.00 | 755,000.00 |
| Municipal Notes | 2,367,191.00 | 1,815,000.00 | 1,815,000.00 |
| **Loans** | | | |
| Franklin Int'l Corp. | 2,500,000.00 | 2,500,000.00 | 2,500,000.00 |
| Franklin Nat'l Credit Corp. | 500,000.00 | 500,000.00 | 410,000.00 |
| **OTHER ASSETS** | | | |
| Accrued Interest Receivable—CD's (FNB) | 19,141.48 | 14,000.00 | 14,000.00 |
| Accrued Interest Receivable—Municipal Notes | 95,877.42 | 73,000.00 | 73,000.00 |
| Accrued Interest Receivable—Loans—FI | 34,027.78 | 34,000.00 | 34,000.00 |
| Deferred Debt Expense—Capital Notes 7.30% | 330,420.08 | 330,000.00 | 0 |
| Deferred Discount—Com'l Paper | 154,971.72 | 143,000.00 | 0 |
| Reserve for Income Taxes | 780,982.58 | 781,000.00 | 0 |
| TOTAL ASSETS | $49,392,318.73 | $48,411,000.00 | $38,271,000.00 |

Since the total liabilities, according to Executive Vice President John Sadlik, were $76,466,644.07 on May 15th and $75,519,000 on May 16th, FNYC was clearly insolvent at the time of the transfer unless the FNB stock had a fair salable value in excess of $27.1 million, and after the transfer unless the FNB stock had a fair salable value in excess of $57.1 million (using, for illustrative purposes, without accepting its validity, book value, the method most favorable to FDIC).

According to the cases, "present fair salable value" means just that; the fair value of presently salable assets. *Glenmore Distilleries Co. v. Seideman*, 267 F.Supp. 915, 918 (E.D.N.Y.1967); *Larrimer v. Feeney*, 411 Pa. 604, 192 A.2d 351 (1963); *Cf. Chase National Bank v. United States Trust Company*, 236 App.Div. 500, 260 N.Y.S. 40, 44 (1st Dept. 1932), *aff'd*, 262 N.Y. 557, 188 N.E. 63 (1933). Where an asset, such as the common stock of FNB, cannot be sold it is not counted in determining the value of available assets under Section 67d of the Bankruptcy Act and Section 271 of the DCL. For Section 67d: *Grandison v. National Bank of Commerce*, 231 F. 800 (2d Cir. 1916); *In re Ouellette*, 98 F.Supp. 941 (D.Me.1951); 2 Collier on Bankruptcy ¶ 101.26 at 101–54, 155, nn. 43, 44 and 46; *see also Allegaert v. Chemical Bank*, 418 F.Supp. 690 (E.D.N.Y.). For Section 271:

*Glenmore Distilleries Co., supra; Larrimer, supra; Ballantine v. Ferretti,* 28 N.Y.S.2d 668 (Sup.N.Y.Co., 1941); and *Chase National Bank v. United States Trust Co.,* 236 App.Div. 500, 260 N.Y.S. 40 (1st Dept. 1932), *aff'd,* 262 N.Y. 557, 188 N.E. 63 (1933).

The facts here are that FNYC tried to sell the stock of FNB to Manufacturers Hanover Trust Company in early May, 1974 and were told on May 11th that that bank was not interested because "there was nothing left on Franklin's bottom line". Thereafter the Secretary of the Treasury, the Federal Reserve Bank of New York, the Comptroller, the FDIC, FNYC and FNB all attempted during May and June 1974 to find a purchaser for FNB but were utterly unsuccessful. In this particular case it is fruitless to argue, as FDIC does, that book value has any meaning. If there were no purchasers or bidders for FNB in May and June 1974, its stock, realistically speaking, had no value and that meant that FNYC was insolvent within the meaning of Section 67 of the Bankruptcy Law and Section 271 of the Debtor and Creditor Law before, on and after the Note conversion on or about May 24th. (*See also* ¶¶ 68–78 and ¶¶ 79–93 above.)

### Debts Beyond its Ability to Pay

While the elements may not be as clear cut on this question as they are on the question of the insolvency of FNYC on and between May 16th and May 24th, 1974, nonetheless, it seems clear "that there existed at the time of the transaction a general intention or belief on the part of the debtor (FNYC) that debts would be incurred beyond [its] ability to pay as they matured." *In re Farmers Federation Cooperative, Inc.,* 242 F.Supp. 400, 402 (W.D.N.C. 1965), citing 4 Collier on Bankruptcy § 67.-36.

On May 24, 1974, when the Note was converted FNYC had semi-annual debt service obligations on its $35 million capital note and quarterly obligations on its $30 million dollar MHTCo note aggregating more than $5 million annually. Moreover, the MHTCo. note was due in April 1977 and the capital notes held by the public were due in November 1979; from and after May 16, 1974, FNYC would receive nothing from FNB since it could not pay dividends unless it generated earnings (12 U.S.C. § 60(b); 12 C.F.R. Sec. 7.6100) and unless it met other restrictions contained in its 1963 capital debentures series.

On May 21 Executive Vice President and Treasurer John Sadlik wrote an interoffice letter to Mr. Schreiber in which he recognized the lack of funds with which to pay the debt service obligations on the above loans:

"Most of the interest on the 7.30% Capital Notes ($35.0 million) and the interest on the MHTCo. loan of $30.0 million must be provided by the bank through the payment of dividends to the Corporation. Since the bank will not have sufficient earnings to pay dividends, permission will be required from the Comptroller of the Currency. It is recommended that the matter be discussed with the Comptroller." (PX 123 at p. 2).

On June 20, 1974, FNYC announced in a press release [15] that it would not have funds to meet its debt service obligations unless funds could be raised by a proposed subscription offering of common stock with the following statement:

"Mr. Gleason pointed out that as a result of the inability of the bank to pay dividends to Franklin New York Corporation, which holds all the banks [sic] common stock, and the fact that the assets of Franklin New York Corporation, other than the Common Stock of the Bank, were limited, Franklin New York Corporation is dependent upon the successful completion by 1975 of the first portion of the previously announced proposed $50 million dollar [sic] subscription offering of the Common Stock of Franklin New York Corporation to provide funds with

---

15. This press release was apparently reviewed in draft by the directors on June 3, 1974. (PX 140, PX 38).

which to continue to meet that Corporation's obligations, principally debt service on its 35 million dollar of 7.30% Notes due November 15, 1979 and its [$]30.0 million Note due April 3, 1977. He added that the holder of the latter note presently had the right to demand immediate payment from Franklin New York Corporation, which could, in turn, result in similar action under the 7.30% Notes, and could result in resort by these creditors to collection procedures, including a levy on the assets of the corporation." (PX 39 at pp. 8–9).

If there be any doubt on the question, a projection of net cash requirements for the six years beginning May 16, 1974 for FNYC prepared by Touche Ross & Co. (PX 82) demonstrates quite conclusively that FNYC officers and directors must have known in May, 1974 at the time of the conversion that FNYC was incurring, and would in the very near future incur, debts beyond its ability to pay. (*See also* ¶¶ 94–98 above).

### III

### UNREASONABLY SMALL CAPITAL

In view of the foregoing findings and conclusions it is unnecessary for us at this juncture to consider and determine whether the Note conversion was also voidable under Section 67d(2)(b) of the Bankruptcy Act and Section 274 of the DCL because FNYC's capital, following the Note conversion was unreasonably small. It is sufficient to note that the above-mentioned cash requirements prepared by Touche Ross & Co., coupled with the other facts herein, quite clearly indicate that FNYC's capital following the Note conversion was unreasonably small.

### IV

### LACHES

FDIC further argues that the Trustee's second and fourth claims, the federal fraudulent conveyance claims based on insolvency and unreasonably small capital, are time barred.

It is true that the amended complaint alleging the claims here in question was filed more than two years after bankruptcy. The only issue as to their timeliness is whether they relate back to the time of the original complaint under F.R.C.P. 15(c). The Rule itself provides for relation back "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."

■ As both the complaint and the amended complaint refer to § 67(d)(2), we hold that the amended complaint does indeed relate back to the time of filing of the original. Since the complaint gave notice of claims based on fraudulent transfer provisions in the Bankruptcy Act, it cannot be asserted by FDIC that it was without notice of the claim, or that it suffered substantial prejudice as a result of the amendments. *Cf. Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479 (6th Cir. 1973), and cases cited therein; 3 Moore's Federal Practice, Section 15.15[3].

### *Conclusion*

■ For the foregoing reasons plaintiff is entitled to a judgment herein, setting aside the conversion and recovering the Note which FNYC exchanged for additional shares of FNB common stock in the Spring of 1974.

Settle judgment on notice.